IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL ACTION** |
| v. | : | **CRIMINAL NO. 21-312** |
| **JOHN BRADY** | : | |

### SENTENCING MEMORANDUM OF DEFENDANT JOHN BRADY

Defendant, JOHN BRADY, by and through his counsel S. PHILIP STEINBERG, ESQUIRE, respectfully submits the following Memorandum to assist the Court in fashioning a just and fair punishment which is not greater than necessary to accomplish the fundamental objectives of sentencing as articulated in 18 U.S.C. § 3553(a).

### I. INTRODUCTION

Mr. John Brady will appear before this Honorable Court to be sentenced in connection with the serious crimes to which he pled guilty and for which he has completely accepted responsibility, namely, One Count of theft from an organization receiving federal funds / aiding and abetting, and One Count of wire fraud, in violation of 18 U.S.C. § 1343, 18 U.S.C. §§ 666(a)(1)(A) respectively. Based upon the forthcoming, as well as the attendant materials attached hereto, Mr. Brady respectfully requests that Your Honor render a sentence that varies downward from the advisory sentencing guideline range and impose a mitigated sentence which does not subject Mr. Brady to incarceration. Such sentence will be sufficient but not greater than necessary to accomplish the goals of sentencing under Federal law.

## II.   PROCEDURAL HISTORY

On August 11, 2021, the U.S. Attorney's Office for the Eastern District of Pennsylvania filed a two-count Information charging John Brady with theft from an organization receiving federal funds and aiding and abetting, in violation of 18 U.S.C. §§ 666(a)(1)(A) (Count 1) and wire fraud, in violation of 18 U.S.C. § 1343 (Count 2). On February 1, 2022, Mr. Brady appeared before the Honorable C. Darnell Jones, II and, pursuant to a negotiated plea agreement, pled guilty to Counts 1 and 2 of the Information. Thereafter, in standard practice, the Court ordered a Pre-Sentence Investigation Report ("PIR").  The report was authored on April 1, 2022 by Senior United States Probation Officer, George H. McGary. Mr. Brady's sentencing is currently scheduled for May 16, 2022.

## III.   FACTUAL HISTORY

The facts and offense conduct relevant to Mr. Brady's case are adequately set forth in the PIR at Paragraphs 27 through 43.

## IV.   OBJECTIONS TO OR DEPARTURES FROM THE SENTENCING GUIDELINES

Counsel has no objections to the PIR as written.

## V.   SENTENCING CONSIDERATIONS

As the Supreme Court has consistently asserted, "'[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.'" *Gall v. United States*, 128 S.Ct. 586, 598 (2007) quoting *Koon v. United States*, 518 U.S. 81, 113 (1996).  This enduring principle was given new life in *United States v. Booker*, 543 U.S. 220, 244 (2005), where the United States Supreme Court held that those provisions of the federal Sentencing Reform Act of 1984 that make

the Guidelines mandatory (18 U.S.C. § 3553(b)(1)), or which rely upon the Guideline's mandatory nature (18 U.S.C. § 3742(e)), to be incompatible with the Sixth Amendment.  Accordingly, the Court severed and excised those provisions, thereby rendering the Guidelines "effectively advisory." *Id.* at 245.

The 3rd Circuit has developed a three-step approach to sentencing that district courts must follow in the wake of *Booker*:

> (1) Courts must continue to calculate a defendant's Guidelines sentence precisely as they would have before *Booker*.
>
> (2) In doing so, they must formally rule on the motions of both parties and state on the record whether they are granting a departure and how that departure affects the Guidelines calculation, and take into account our Circuit's pre-*Booker* case law, which continues to have advisory force.
>
> (3) Finally, they are required to exercise their discretion by considering the relevant § 3553(a) factors in setting the sentence they impose regardless whether it varies from the sentence calculation under the Guidelines.

*United States v. Gunter*, 462 F.3d 237, 247 (3rd Cir. 2006) (quotation marks, brackets, and citations omitted), citing *United State v. King*, 454 F.3d 187, 194, 96 (3rd Cir. 2006); *United States v. Cooper*, 437 F.3d 324, 329-30 (3rd Cir. 2006).  Thus, steps one and two mirror the pre- *Booker* scheme, in which any sentence outside the applicable sentencing range must be imposed pursuant to the departure framework provided by the Guidelines.

It is 18 U.S.C. § 3553(a), however, that ultimately governs the imposition of the defendant's sentence, with the Guidelines calculation operating as merely one factor amongst the variety of considerations listed in this statute.  *See Booker*, 543 U.S. at 246.  As the Supreme Court has emphatically stated, a sentencing judge "may not presume that the Guidelines range is reasonable." *Gall*, 128 S.Ct. at 596-97.  Rather, it is the mandate in 18 U.S.C. § 3553(a) that "[t]he

court shall impose a sentence sufficient, ***but not greater than necessary***, to comply with purposes set forth in paragraph (2) of this subsection," that guides trial courts' sentencing determinations. 18 U.S.C. § 3553(a) (emphasis added). These purposes, as listed in 18 U.S.C. § 3553(a)(2), include the need for the sentences imposed—

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed education and vocational training, medical care, or other correctional treatment in the most effective manner.

Also, sentencing courts are directed to consider the following factors:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant (18 U.S.C. § 3553(a)(1));
>
> (2) the kinds of sentences available; (18 U.S.C. § 3553(a)(3));
>
> (3) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct (18 U.S.C. § 3553(a)(6)); and
>
> (4) the need to provide restitution to any victims of the offense (18 U.S.C. § 3553(a)(7));

As the 3rd Circuit has been adamant in emphasizing, "[t]he record must demonstrate the trial court gave meaningful considerations to the § 3553(a) factors. *Cooper*, 437 F.3d at 329.

In the Sentencing Reform Act (hereinafter "SRA") (28 U.S.C. § 994 (Oct. 6, 2006)), Congress specifically instructed that the United States Sentencing Commission "shall promulgate and distribute to all courts of the United States and to the United States Probation system guidelines, as described in this section, for use of a sentencing court in determining the sentence to be imposed in a criminal case, including a determination ***whether*** to impose a sentence to

probation, a fine, or a term of imprisonment." 28 U.S.C. § 994(a)(1)(A) (emphasis added). By doing so, Congress presented probation as a distinct type of sentence with independent value and a prominent role to play in the Sentencing Guidelines, as opposed to a lenient option to be used only in extraordinary circumstances. Reinforcing their intent that probationary sentencing should have a meaningful role in the Guideline framework, Congress explicitly affirmed the appropriateness of probationary sentences in criminal cases "in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense." *Id*. at 994(j).

Despite this Congressional mandate, the Sentencing Commission failed to create a sentencing scheme that sufficiently accommodates the role that probationary sentences were intended to play in the Guidelines. The most glaring example of this institutional failure appears in the Sentencing Table, which includes imprisonment as an option in each of the 258 specified sentencing ranges, yet fails to identify any cases – even those with an offense level of one and a criminal history of zero – where probation is the recommended sentence. Further, in U.S.S.G. § 5B1.1(a), the Commission designated that a probation is not "authorized" unless the defendant's Guideline range is within Zone A or B of the Sentencing Table. All imprisonment sentences in Zone A are limited to 0 to 6 months and Zone B includes ranges that vary from 1 to 15 months. These limitations effectively preclude nearly all defendants from being eligible for a probationary sentence. Thus, the basic guiding structure found in the Sentencing Table effectively precludes criminal defendants' eligibility for a probationary sentence regardless of whether they fall within the class of defendants for which probation was intended to apply under 28 U.S.C. § 994(j) of the SRA.

In *United States v. Kimbrough*, 552 U.S. 85 (2007), the United States Supreme Court ruled that a District Court did not abuse its discretion by imposing a sentence below the Guideline range based on the sentencing Court's recognition of the disproportionate terms of imprisonment resulting from the 100-1 crack-to-powder cocaine ratio operating in the Guidelines Drug Table. *Id*. at 92-95, 108-10 (noting that this ratio results in sentence for crack cocaine being three to six times longer than for powder). The Court's ruling recognized the valuable and "important institutional role" of the Sentencing Commission, which has "the capacity courts lack to base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise." *Id*. at 108-09 (citation and internal quotations omitted). So long as the Commission is acting within this characteristic institutional role by engaging in meaningful analysis of empirical data and national experience, its conclusions based on this data will be regarded with the appropriate due deference. Since the Commission failed to fulfill this role with respect to the 100-1 ratio operating in the Guidelines, sentences reflecting this ratio were not entitled to such deference and it was not an abuse of discretion to vary below the guidelines. *Id*.

"*Booker* permits the court to tailor the sentence in light of other statutory concerns as well." *Pepper v. United States*, 562 U.S. 476, 490 (2011) citing *Kimbrough*, 552 U.S. at 101. By failing to adequately account for probationary sentences, the United States Sentencing Commission failed to fulfill its characteristic institutional role and this Court should feel free to impose a probationary and/or non-confinement sentence in Mr. Brady's case. This failure is not simply a consequence of not accounting for the role probation was intended to play in the Guidelines as specified in 28 U.S.C. §§ 994(a)(1)(A) and (j), but also results from the Commission's flawed empirical analysis in crafting the Guidelines themselves. As the Supreme Court of the United States has acknowledged, the Sentencing Commission examined "tens of thousands of sentences" as part of

their empirical analysis when the Guidelines were first created. *Rita v. United States*, 551 U.S. 338, 349 (2007); *Kimbrough*, 552 U.S. at 96. This empirical analysis was severely flawed, however, because the Commission failed to include probationary sentences in its analysis of what sentences were being customarily imposed for particular crimes. See United States Sentencing Commission, Supplementary Report on the Initial Sentencing Guidelines and Policy Statements, 23 (June 18, 1987) available at https://www.ussc.gov/sites/default/files/pdf/guidelines-manual/1987/manual-pdf/1987_Supplementary_Report_Initial_Sentencing_Guidelines.pdf ("The guidelines use the term 'offense level' to refer to permissible sentencing ranges. . . . As used in Table 1(a), the 'sentence level' is the offense level that is closest to the average time currently served by first-time offenders ***who are sentenced to a term of imprisonment***") (emphasis added). As a result, the Sentencing Guidelines fail to account for the intended role of probationary sentences since such sentences were omitted from the empirical analysis employed by the Commission in creating the Guidelines.

As a result of employing a data set that omitted sentences imposing probation, it is no wonder that the percentage of federal defendants sentenced to purely probationary sentences has so precipitously declined from approximately 48% in 1984 to 6.1% in 2008. United States Sentencing Commission, *The Federal Sentencing Guidelines: A Report on the Operation of the Guidelines System and Short-Term Impacts on Disparity in Sentencing, Use of Incarceration, and Prosecutorial Discretion and Plea Bargaining* 376 Fig. 14 (1991); United States Sentencing Commission, *2008 Sourcebook to Federal Sentencing Statistics*, Table 16 (2008) available at http://www.ussc.gov/ANNRPT/2008/Table16.pdf. Moreover, the length of sentences involving incarceration has nearly tripled. Frank O. Bowman III, *The Failure of the Federal Sentencing Guidelines: A Structural Analysis*, 105 Colum. L. Rev. 1315, 1328 50n. 65 (2005).

By failing to account for the more pronounced role that probationary sentences were intended to play in the Federal Sentencing Guidelines and employing a flawed data set in constructing the Guidelines, the United States Sentencing Commission failed to fulfill its characteristic institutional role. As a consequence of this failure, as in *Kimbrough*, a sentencing court is granted ample discretion to impose a term of probation in cases where such a sentence is called for, such as those specified in 28 U.S.C. § 994(j). In passing the SRA, Congress intended that probation, along with a panoply of conditions that a Court may impose in order to effectuate the punitive and deterrent effects of probation, would retain a meaningful role in the federal sentencing scheme; not simply flood federal prisons with inmates. See 28 U.S.C. § 994(g) ("The sentencing guidelines prescribed under this chapter shall be formulated to minimize the likelihood that the Federal prison population will exceed the capacity of the Federal prisons"); United States Department of Justice, *Bureau of Justice Statistics Bulletin: Prisoners in 2008*, appx. Table 24 available at https://www.bjs.gov/content/pub/pdf/p08.pdf (in 2008, federal prisons were operating at 35% over capacity). Further, as the Supreme Court for the United States has adamantly asserted, the imposition of a probationary sentence is not to be understood as an act of extreme leniency only warranted in extraordinary cases, but rather a "substantial restriction on liberty" with serious consequences should a defendant violate the terms of probation. *Rita*, 552 U.S. at 48-49. This is especially the case given that a sentencing judge is entitled to impose a variety of additional onerous conditions as part of fulfilling the terms of their sentence.

As a final point of consideration with regard to the propriety of probationary/non-confinement sentences, the Court receives statutory guidance in addition to 18 U.S.C. § 3553(a) from 18 U.S.C. §3582(a), which instructs that "***imprisonment*** is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a) (emphasis added).

## VI.   APPLICATION OF THE SENTENCING FACTORS

Applying the statutory factors set forth in 18 U.S.C. § 3553(a) to Mr. Brady's case, Counsel submits that a sentence which varies substantially downward from the advisory sentencing guidelines is sufficient but not greater than necessary to accomplish the goals of sentencing.

### A.   The Kinds of Sentences Available – 18 U.S.C. § 3553(a)(3)

The options available to this Court with respect to what kind of sentence to impose upon Mr. Brady are up to thirty (30) years of incarceration, up to six years of supervised release, a maximum fine of $250,000 per count (maximum total of $500,000 for all three counts), and restitution in the total amount of $16,509.00.  Given an offense level of 11 and a criminal history category of I, the advisory guideline imprisonment range in this matter is eight (8) months to fourteen (14) months imprisonment.

### B.   History and Characteristics of the Defendant – 18 U.S.C. § 3553(a)(1)

John Brady was born on March 10, 1961 in Philadelphia, Pennsylvania to the marital union of Joan and Joseph Brady. Mr. Brady is one of seven (7) children, four of which have tragically passed away during his lifetime.  Mr. Brady was raised in a quiet neighborhood in Philadelphia which he describes as "blue-collar." Mr. Brady was fortunate to experience a relatively normal childhood with no significant history of abuse or criminal behavior within the household.  Prior to the offense conduct, Mr. Brady had very little (if any) substantial; negative contacts with the criminal justice system.

Furthermore, Mr. Brady served our county with honor and distinction in the United States Marine Corps from June 1980 until he was honorably discharged in 1986. During his time in service Mr. Brady received numerous accolades for his diligent and faithful service to our nation.

Following his honorable discharge from the Marine Corps, Mr. Brady joined the Pennsylvania Army National Guard from 1990 through 1993.

Notwithstanding his diligent service to our nation, Mr. Brady is also a devoted father. He is the loving father of five (5) children, all of whom he maintains and extraordinarily close relationship. Mr. Brady's eldest child, Ms. Kristin Brady (39), is the result of an ephemeral relationship with his paramour at the time, Ms. Andrea Tadeo. Unfortunately, Ms. Tadeo struggled with narcotics addition making it difficult for Mr. Brady to maintain a meaningful relationship with his daughter. Regardless of these difficult circumstances, Mr. Brady characterizes his relationship with his eldest daughter as "close." In 1986, Mr. Brady married Ms. Connie Becchio (58). This relationship produced three (3) children, John Brady Jr. (34), Cara Catagnus (30), and Amy Brady (28). Despite a contentious separation with his former wife, Mr. Brady has remained steadfast in his commitment to being a present, supportive father figure in his children's lives. Mr. Brady's children are unaware of his current conviction and pending sentence, as Mr. Brady's seeks to bear sole responsibility for the shame and embarrassment he has brought upon himself and his family.

In 1986, Mr. Brady started his career with SEPTA as a Maintenance Trainee earning a modest $6 per hour. Throughout his 33-year career with SEPTA, Mr. Brady rose through the ranks and eventually assumed the role of Deputy Director of Maintenance and Construction in the Suburban Transit Division, supervising approximately forty (40) employees. During his career with SETPA, Mr. Brady has attended a plethora of skill advancement and continuing education courses in order to more effectively carry out his duties as the Deputy Director. Since his termination in 2021 as a result of this matter, Mr. Brady has maintained gainful employment as a HVAC contractor with Tri-County Residential Contractors.

Moreover, the conduct herein is aberrant behavior for Mr. Brady and is a permanent stain on what would otherwise be a thirty-year long, spotless service record both with SEPTA and the United States Military. Nevertheless, Mr. Brady is acutely cognizant of the ramifications his conduct has had, and will have on his life going forward, and offers no excuse for his actions.

### C.  Nature and Circumstances of the Offense – 18 U.S.C. § 3553(a)(1)

At or beginning in 2013, SEPTA managers engaged in a fraud and bribery scheme with SEPTA vendors in order to defraud SEPTA by abusing SEPTA's employee P-Card system. The vendors provided SEPTA managers with cash and merchandise in exchange for the vendors billing SEPTA for products that the vendors did not actually provide to SEPTA. Mr. Brady was the smallest participant in the scheme which had been in operation years prior to Mr. Brady's involvement.

### D.  The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records who have been Found Guilty of Similar Conduct – 18 U.S.C. § 3553(a)(2)

There is no doubt that fraud is a serious local and nationwide issue, but this case largely requires us to reach the root cause to create any meaningful and beneficial changes. Mr. Brady's conduct in the instant case is certainly not an indicator of who he is or what we should expect. Mr. Brady acknowledges the wrongfulness of his conduct and offers no excuse for his actions. As stated above, of the defendants charged (separately) within this scheme, Mr. Brady has the lowest fraud loss attributable to him. Concurrently, only Jesse Fleck has been sentenced thus far. As per the PIR, Mr. Fleck is jointly and severally liable for a loss of over $130,000.00 to SEPTA; he was sentenced to period of two (2) years of supervised release.

### E. The Need to Provide Restitution to Any Victim of Offense – 18 U.S.C. § 3553(a)(7)

Pursuant to 18 U.S.C. § 3663A, restitution in the total amount of $16,509 shall be ordered in this case to be paid to SEPTA. The most effective means of furthering the goal of restitution and Mr. Brady's sincere desire to recompense the victims of his crime is to permit Mr. Brady to continue to work within the community so that he can amend the harm he has caused.

### F. Purposes of Sentencing – 18 U.S.C. § 3553(a)(2)

#### 1. Promoting Respect for the Law and Providing Just Punishment for the Offense – 18 U.S.C. § 3553(a)(2)(A)

Respect for the law does not result from imposing unnecessarily harsh sentences, but just ones that accurately reflect the guiding legal principles which have been discussed throughout Mr. Brady's Sentencing Memorandum.

#### 2. To Afford Adequate Deterrence to Criminal Conduct – 18 U.S.C. § 3553(a)(2)(B)

Adequate deterrence refers to both the effect of Mr. Brady's sentence on deterring the crimes of others (general deterrence) and on deterring himself (specific deterrence). Both concerns are not an issue herein. As it relates to specific deterrence, it is patently inconceivable Mr. Brady will engage in criminal conduct in the future. Mr. Brady was charged and convicted for stealing approximately $12,000 over a thirty (30) year career. As a result, he will lose the lifetime pension and benefits he earned over that career. Expectantly, that loss to Mr. Brady and his family could exceed $1,000,000.00. If the public at large (working in a similar position as Mr. Brady) are not deterred by this collateral consequence, the theory of "general deterrence" is a theory that fails to exist in reality.

### 3. Protecting the Public from Further Crimes of the Defendant – 18 U.S.C. § 3553(a)(2)(C)

The public does not need protection from further crimes of Mr. Brady.

### 4. Providing the Defendant with Needed Education and Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner – 18 U.S.C. § 3553(a)(2)(D)

Mr. Brady is a skilled tradesman and worker as demonstrated by his otherwise spotless 33-year career with SEPTA and lengthy military service. As such, this factor does not relate to the instant matter of sentencing before the Court.

## VII. ROLE IN THE OFFENSE

Mr. Brady the smallest (financially) participant in a fraud/bribery scheme involving SEPTA funds and monetary kickbacks for improperly billed invoices. Mr. Brady personally received approximately $12,699.00 worth of items from SEPTA affiliated vendors, resulting in at least $16,509.00 in fraudulent billing towards SEPTA in total.

## VIII. REQUEST FOR VARIANCE

This is a case that has been both fairly and zealously prosecuted by the Government. To their credit, the government has sought a reasonable resolution for Mr. Brady. Mr. Brady and his family have already paid a tremendous price for his offense which resulted in forfeiture of his entire pension. Additionally, the "totality of circumstances" as documented above warrant a downward variance from the advisory guideline range. A deprivation of his liberty would be an unbearable harsh result not just to Mr. Brady but to his loving family and supportive community as well. Conversely, a short sentence of community supervision will be "sufficient but not greater than necessary" to accomplish the goals of sentencing.

Respectfully submitted,


**/s/ S. PHILIP STEINBERG**
S. PHILIP STEINBERG, Esquire
Attorney for Defendant
Two Penn Center
1500 John F. Kennedy Boulevard
Suite 1300
Philadelphia, PA 19102
Phone: (215) 845-0250

**CERTIFICATE OF SERVICE**

S. Philip Steinberg, Esquire hereby certify that a true and correct copy of the within Sentencing Memorandum has been served electronically upon:

**HONORABLE C. DARNELL JONES II**
**15613 U.S Courthouse**
**601 Market Street**
**Philadelphia, PA 19106**

**U.S. Attorney's Office**
615 Chestnut St
Suite 1250
Philadelphia, Pa 19106

**/s/ S. PHILIP STEINBERG**
S. PHILIP STEINBERG, Esquire
Attorney for Defendant
Two Penn Center
1500 John F. Kennedy Boulevard
Suite 1300
Philadelphia, PA 19102
(215)-845-0250